Filed 12/18/15  In re A.B. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re A.B. et al., Persons Coming Under the Juvenile Court Law. | C078211 |
| SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> B.B. et al., <br><br> Defendants and Appellants. | (Super. Ct. Nos. JD229535, JD229936, JD233798) |

_____

| | |
|---|---|
| In re L.B., Jr. et al., Persons Coming Under the Juvenile Court Law. | C078533 |
| SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> B.B. et al., <br><br> Defendants and Appellants. | (Super. Ct. Nos. JD229532, JD229533, JD229534) |

1

In these consolidated appeals, father Leo B. and mother Becky B. challenge the juvenile court's order terminating their parental rights as to minors J.B., K.B., C.B., L.B., Jr., P.B., and A.B. (Welf. & Inst. Code, § 366.26; unless otherwise stated, statutory references that follow are to the Welfare and Institutions Code.) Both parents contend the juvenile court erred by finding C.B. adoptable. Mother contends the court erred by finding that the beneficial parental relationship exception to adoption did not apply. Father contends that if this court reverses the termination of mother's parental rights, we must also reverse the termination of his own.

We affirm the orders of the juvenile court.

FACTS AND PROCEEDINGS

This is the second proceeding involving these minors in this court, except for A.B. who was not yet born when the first proceeding came before us. We take the facts through the jurisdiction/disposition stage of the current proceeding from our previously filed opinion in this proceeding, which we judicially notice. (*In re L.B., Jr., et al.* (Aug. 19, 2014, C075696) [nonpub. opn.]) (*L.B.*).)

*The First Proceeding*

In 2009, Sacramento County Department of Health and Human Services (the department) filed section 300 petitions as to all the minors except A.B. The juvenile court sustained the petitions as amended, placed the minors in foster care, and ordered reunification services for the parents. After returning the minors to the parents' custody in 2010, the court terminated dependency jurisdiction in May 2011. (*L.B., supra*, typed opn. at p. 2.)

*The Second Proceeding*

In September 2013, the department filed new petitions as to all six minors, alleging father's physical abuse of J.B. and mother's failure to protect him, the parents'

2

failure to provide adequate shelter and care for the minors, and domestic violence between the parents. At that time, J.B. (a boy) and K.B. (a girl) were nine-year-old twins; C.B. (a boy) was six years old; L.B., Jr. (a boy) was five years old; P.B. (a girl) was four years old; and A.B. (a girl) was six months old.

After a contested jurisdiction/disposition hearing in January 2014, the juvenile court sustained the allegations of the petitions as amended, ordered the minors placed in foster care, and granted the parents reunification services. (*L.B., supra*, typed opn. at p. 5.)

In June 2014, the department recommended terminating the parents' reunification services and ordering a permanent plan of adoption for the minors. The girls were placed in one foster home and the boys in another. The girls' caregiver expressed interest in adopting P.B. and A.B., but not K.B.; the boys' caregiver did not wish to adopt any of them. It was recommended that if the minors could not all be in the same home, placements should be found that would maintain the sibling relationship, and the twins, J.B. and K.B., should be placed together.

The older minors (J.B., K.B., and C.B.) had had greater struggles in placement than the younger minors (L.B., Jr., P.B., and A.B.), and felt some loyalty to the birth parents. The boys' caregiver was concerned about their physical aggression toward each other, destruction of property in the home, and refusal to follow rules. C.B. had the most needs, being hyperactive and overly dependent on L.B., Jr.

C.B. was an outgoing and energetic seven-year-old boy who sometimes "struggle[d] with personal space, by touching peers or being too rowdy or having emotional outbursts." He had been in counseling since November 2013, but his therapist had not provided treatment plans or reports. After a psychiatric evaluation, the department applied for permission to administer a psychotropic drug used to treat Attention Deficit Hyperactivity Disorder (ADHD).

3

The parents had refused to contact the department or to take part in services. During their twice-weekly supervised visits with the minors, father displayed anger, told the minors to "keep home business at home," and claimed the "court people" lied about the parents. Father had chronic substance abuse and anger problems. Mother could not make decisions without father's approval and would not show up for visits without him.

On July 10, 2014, the juvenile court continued reunification services as to the boys, but terminated them as to the girls and referred their cases for a section 366.26 hearing (scheduled for October 30, 2014, but continued to January 5, 2015).

On August 14, 2014, the department requested the termination of reunification services and the scheduling of a section 366.26 hearing as to the boys. On September 18, 2014, the juvenile court granted the department's request and set a section 366.26 hearing as to the boys on January 8, 2015.

On September 15, 2014, the department requested a reduction in the parents' visitation because the girls had been moved to prospective adoptive homes (K.B. with a nonrelative extended family member (NREFM), P.B. and A.B. in a homestudy-approved foster home). On October 29, 2014, the juvenile court granted the request.

On October 3, 2014, the department filed an application to change medication for C.B., who was diagnosed with Disruptive Behavior Disorder Not Otherwise Specified and ADHD "Combined Type." The juvenile court granted the application.

The department's section 366.26 report as to the girls, filed October 17, 2014, recommended terminating parental rights and ordering adoption as the permanent plan. The girls remained in their respective placements. Both sets of foster parents wished to adopt and were committed to maintaining the sibling connection. K.B.'s foster parents wanted J.B. placed with them, as K.B. wished. (J.B. wanted to return to the parents' home, but if that was not possible, he wanted to live with K.B.) P.B.'s and A.B.'s foster parents had an approved homestudy, and K.B.'s foster parents were expected to pass the homestudy assessment.

K.B. was significantly delayed academically, though apparently due to "lack of exposure" rather than cognitive deficits; she was also "the most strong willed" of the minors, engaging in power struggles with others, and trying to manipulate them. P.B. complained that when they were placed together K.B. was "mean" to her, hitting and kicking her.

All three minors were "highly adoptable . . . beautiful, healthy, and developmentally on track."

According to the report, it would not be detrimental to the minors to terminate parental rights. Father had failed to rehabilitate from substance abuse and anger management problems, and mother lacked the cognitive abilities to parent safely. The parents' visits were consistent but problematic: the parents gave the minors negative messages, and K.B. could be "deregulated" for days after a visit. Though the minors loved the parents, the parents were not primarily responsible for the minors' day-to-day needs. The two younger girls had spent a major part of their lives in dependent care and did not have a strong connection to the birth parents. K.B. had a greater connection and might suffer short-term detriment from not seeing the birth parents, but she had been with her current caregivers for a year and was excited to grow up in their home.

On November 9, 2014, J.B. was placed with K.B.'s foster parents.

On November 26, 2014, L.B., Jr., was placed in a prospective adoptive home.

On December 4, 2014, C.B. was moved to a new placement due to behavior problems.

On December 31, 2014, the department filed a section 366.26 report as to the boys. This report also recommended terminating parental rights and ordering a permanent plan of adoption.

The department had requested reduced parental visitation in the minors' best interest. During visits, the parents favored some children and ignored others, failed to supervise the children properly, and allowed some siblings to show disrespect to others

without intervening; the children often interacted only minimally with the parents or each other.

All of the boys had a change in placement during the last reporting period. L.B., Jr., was thriving in a homestudy-approved home; the foster family frequently invited his siblings for social occasions. J.B. was excited to be placed with K.B. and appeared happier than ever.

C.B. had two failed placements since the last court report: his long-term foster parent gave notice on October 5, 2014, and his subsequent foster parent gave notice on December 4, 2014. In the second placement, C.B. repeatedly assaulted and injured a younger child in the home. He was now with a "seasoned parent" whose home had no younger children; the foster parent was working closely with C.B., who "is trying to control his anger and wants to do well."

C.B. and his brothers "play very rough." C.B. "lacks age appropriate boundaries and self control, especially related to younger children." He intimidated younger children verbally and physically. He had a short attention span. He had recently broken a windshield in his current placement. In school, he could "present as tough" and "tends to intimidate peers," but the school, which knew of his CPS history, was making allowances for his behavior. He was performing below grade level, but not far enough below to qualify for I.E.P. services.

C.B. had violent tendencies. He was quick to deny charges against him and to accuse others of lying. His current foster parent reported that he would scream and cry if a peanut butter and jelly sandwich was not made the way he liked it. He was "highly reactive" and was "working to use his coping skills." However, all his foster parents reported that he had "a sweet side" and tried very hard to fight his immediate impulses. He was enrolled in services through two different providers; his services were being transferred to a new provider "to proactively address the aggression and acting-out behavior." He was still taking psychotropic medication.

6

All of the boys showed "anger issues, aggression and learned violence tendencies." J.B. and L.B., Jr., admitted to playing rough.

The foster parents did a great deal to maintain contact among the siblings, now placed in four different homes. Due to the boys' history of aggression among themselves, it was not appropriate to place them together now.

The NREFMs of J.B. and K.B. were interested in having C.B. placed in their home for adoption "if and when his anger is better controlled," but they had an in-home day care center and could not risk C.B. intimidating or hurting a small child. During holiday visits, when no day care children were present, C.B. did very well and the foster parents had no concerns about him.

L.B., Jr., and J.B. were placed in prospective adoptive homes with foster parents who were committed to providing permanence. C.B. was not currently in a homestudy-approved home, but he was "young, bright, handsome, and adoptable"; the goal was to stabilize his behavior, then place him with J.B. and K.B. If that proved inappropriate, adoption homefinding for C.B. would follow.

All of the boys were adoptable, being "young, healthy, developmentally on target in many areas, and handsome, engaging boys." While they were "working through aggressive behavior and school delays," these problems were "very much within the range of behaviors and conditions that many waiting families are willing to tackle." When C.B. could "effectively demonstrate use of coping skills," he would be moved to an adoptive home. He was "making steady progress and [was] motivated to do better"; though "stubborn," according to his current caregiver, he had "a sweet heart" and was "not the most difficult child" she had successfully parented.

J.B., being older than the others and having a longer history with the birth parents, might suffer short-term detriment from termination of parental rights. He had said he wanted to go back to the parents, but he had also said he liked living with his sister and current foster parents. He understood that if adopted, he could seek out the birth parents

7

when he turned 18, and his caregivers had told him they would help him do so. As with the other boys, the benefits of adoption would outweigh any short-term detriment to him.

*The Girls' Section 366.26 Hearing*

At the section 366.26 hearing on the girls, K.B. testified that the visits with the parents and her siblings were fun; they "just play." She wanted the visits to continue. She thought her siblings were okay in their foster homes. She did not know if the other foster parents would let her see her siblings if they were adopted.

According to K.B., no one had talked to her about adoption or about staying with her foster parents. (She claimed she did not remember conversations with the social worker.) She did not know how she would feel about staying with the foster parents. She worried about the children in the foster parents' day care center "being mean."

K.B. thought adoption meant that if parents are not taking care of their kids and the kids stay in foster care for 12 months, they get adopted. She did not think it had anything to do with whether she got to see her parents again. If she did not see her mother or her siblings (other than J.B.) again, she would be "[m]ad." She was "[m]ad" when her visits with mother ended. However, she did not miss living with her other siblings.

If K.B. could choose whom she got to live with, it would be her present foster parents. However, she would not want to live with them forever, and did not know when she would want to stop living with them.

When she lived with her parents, she liked "home school" because "[m]ostly you get a big vacation."

Cindy Clark, the adoptions social worker, testified as follows:

Clark had a master's degree in counseling psychology and had taught 13 semesters in junior college in that field. She had qualified as an expert witness in social work,

8

adoption, psychology, and attachment. She had raised children suffering from Reactive Attachment Disorder for 20 years and had 200 hours of training in that subject.

Clark received the case around July 25, 2014, and subsequently wrote the section 366.26 report. Since the report, J.B. had been placed in K.B.'s foster home. P.B. and A.B. were placed together. The other two boys (C.B. and L.B., Jr.) were not placed with any of the girls.

The twins were "making a phenomenal transition" in their foster home. When K.B. was placed there in September 2014, she was oppositional, resisting everything; now, she was doing extremely well in the home, attending school daily, working well with her tutor, and cleaning her room. The foster parents had completed their homestudy application and training, and the agency worker anticipated speedy approval of the homestudy. They were committed to providing permanency through adoption for K.B. and J.B.

K.B. would also be adoptable by other families. Clark had never found a definition of "generally adoptable" in the Welfare and Institutions Code, but based on her experience it would be easy to find at least 30 prospective foster homes for a "beautiful, articulate, vivacious, spunky, fun eleven year old" such as K.B.; it would be harder (though certainly possible) to find many such homes if she were part of a sibling group.

P.B. and A.B. had adjusted "phenomenally" to their new home, calling their caretakers "mom and dad" and seeking them out for care. P.B. did not want to live with K.B., who was mean to her. P.B. had not requested to go back to the birth parents. She had never asked about visiting with her brothers.

Clark observed visits by the parents on September 3, 2014, and October 22, 2014. The visits were safe and well supervised. However, children ignored each other or were ignored by the parents, and disrespectful comments by children (J.B. in particular) about others were not "redirected." During visits, the siblings would engage in "parallel play" rather than "interactive play"; that is, they would seldom all engage and interact together.

9

K.B. would seek out father and tell him what was going on, almost to the point of tattling; she did homework with mother, who responded appropriately. Both K.B.'s current foster parent and her previous foster parent told Clark that K.B. would be sad and resistant to redirection for a day or two after visits, then return to normal.

All the foster parents worked very hard to maintain sibling contact. Clark expected these efforts to continue if the minors were adopted.

Before transitioning K.B. from her prior foster home, Clark explained to her that it would be up to the judge or referee whether K.B. would return to her parents or "move on to a growing up home," in which she would live until she turned 18. If that happened, she would not be able to see her parents until age 18, but her foster parents had said they would help her to set up a meeting with them at that time; in the meantime, she could still hold them in her heart. K.B. was initially upset to hear this, but then requested placement with the NREMFs she named and asked for J.B. to be placed with her.

K.B. also wanted C.B. to be placed in her foster home, but this was not possible as long as day care children were present "because [C.B.] has hit younger children on many occasions." He could not live there until he changed his behavior, and could not even visit when day care children were there. Clark told K.B.'s foster parents that until C.B. learned to control his impulses (which he was working very hard to do) it would be an inappropriate placement.

In determining that it would not be detrimental to the minors to terminate parental rights, Clark considered the percentage of the minors' lives they had been in out-of-home care, as well as the quality of care they received from the parents. P.B. and A.B. had spent the greater part of their lives in foster care. K.B., who had lived longest with the parents, had suffered serious problems in their care: due to missing extended periods of school and living in a "chaotic" home, she had developed significant educational "lags" and was functioning two years below grade level. Now that she was in a "structured and nurturing" home and having her needs met, she was "presenting each month as happier,

10

more emotionally connected to her [NREMFs], and . . . more ambivalent about . . . going back to mom and dad as her preferred home." She was also getting intensive tutoring to bring her up to grade level.

The minors were placed in different foster homes largely to accommodate K.B.'s wishes: if they had all been placed together, K.B. would have been far less motivated to cooperate than she was with the NREFMs, with whom she had a strong emotional connection. But the NREFMs could not have met the needs of all six minors. Furthermore, the "chaos," "aggression," and "violence" within the sibling group made it unsafe to place them all together.

The minors had a "trauma bond" with each other. Children raised in a chaotic environment where their basic needs are not met do not learn boundaries or self-regulation, and their interaction with each other is "maladapted." They can act very differently in a structured setting. They can also transfer their emotional connections from their birth parents to their new caretakers, so that they suffer only short-term detriment, if any, from severing the connection to the birth parents.

Mother testified that she did not agree with the recommendation to terminate parental rights because "[w]e didn't do anything wrong." She had continued to visit the minors as often as allowed. The last visit went well; they "played and talked and visited." The visits, except those where mother saw A.B. alone, could include all six minors at once.

Father testified that he also disagreed with the recommendation to terminate parental rights. He regularly visited the minors. They would usually run toward him, yelling "dad." They were usually excited during the visits, although "there's good days, and there's bad days with kids."

The juvenile court found the minors were adoptable and likely to be adopted. Although the parents had visited the minors regularly, the beneficial parental relationship exception to adoption did not apply.

11

The two younger minors had spent little time in parental custody. K.B. had struggled academically and emotionally, but had begun to improve while living with her foster parents. The minors had suffered "disruption, chaos, and turmoil" as they were returned to the parents and then removed again for recurring neglect.

K.B. said she enjoyed the parents' visits, but there was little information on that subject as to P.B. or A.B., except that P.B. had sometimes felt left out. The parents had not played a parental role for some time, except for helping K.B. with her homework. K.B. and the parents described the visits as a "play time." The parents had "essentially not advanced beyond supervised visitation."

The minors looked to the foster parents to meet the minors' needs. They were thriving in their current placements. The parental relationship, even as to K.B., was not so significant as to outweigh the benefit of a stable, permanent home through adoption.

The sibling relationship exception to adoption also did not apply.

For all the above reasons, the juvenile court entered orders terminating parental rights and ordering adoption as the permanent plan for the minors.

*The Boys' Section 366.26 Hearing*

Clark testified that she received the boys' case on October 10, 2014. She had seen all of the boys at least once a month since then.

C.B. was generally adoptable. Although there was no clear definition of the term, Clark had found that a single child, particularly one under eight years old, who was "generally healthy, emotionally secure, [and] doing well in school" was generally adoptable. If he were to be placed with his siblings as part of a large sibling group, he would be specifically adoptable. Clark acknowledged, however, that C.B. had "some emotional issues that he is working through."

C.B. had been in four placements since Clark received the case. In the first placement, where the three boys were placed together, the foster parent gave notice as to

12

C.B. because of aggression and fighting among the children, but these continued after C.B. left; the boys said father had told them "it's okay to fight it out," and J.B. said he did not have to listen to teachers or foster parents. In the second placement, C.B. was housed with two children the caretakers had previously adopted; he was removed because of six instances of aggression toward the little boy in the home. He was removed from the third placement because of deficiencies in the home, not because of his conduct. He had been placed for the last 30 days with a foster parent in her 70s who had no younger children in the home, and was doing very well there.

C.B. was "great. He's cute. He's funny. He's affectionate. He's charming. He's engaging." However, he "loves the word no. . . . He is obstinate and stubborn. He's reactive. He has a difficult time regulating. He quickly escalates and does not have age-appropriate coping mechanisms that he can successfully use to minimize his impulsive tendencies."

C.B. received intensive therapy at school and at home, including counseling and short-term behavior intervention services; he was making progress in therapy, and there were plans to reduce the amount he received. He also continued to receive psychotropic medication. The goal of therapy was to get him to use words to express his feelings and to wait before reacting. He would habitually say: "I'm trying so hard to be good. I'm trying so hard to make good choices." When he gets a lot of attention, he does extremely well; when there are younger children around, or sibling rivalry becomes involved, or when he is not allowed to be in control, he does not do so well.

In spite of C.B.'s behavior problems, Clark thought she could find eight to 10 families within two hours that were looking for a single seven- or eight-year-old child such as C.B., "[i]f he were only with two parents where he was not re-traumatized or reengaging with their siblings and recreating the trauma bond." "For the most part, he would be a delightful child." However, Clark was not homefinding for C.B. at this time

because she wanted him to continue to stabilize so that he could be placed with one of his brothers.

After C.B.'s recent meltdown over a peanut butter and jelly sandwich that was not made the way he likes it, Clark talked him through it; he said, "well, that's the way it's supposed to be." C.B. wanted control over what he could control right now, but he is cognitively able to learn and process new ways of doing things, whether making a peanut butter and jelly sandwich or interacting with other children.

C.B. was learning coping skills and how to use them. He was "stabilizing" and "trying very hard." He was a "great kid. Happy boy. Social boy." He was doing very well academically and had friends. He was not having any problems in his current placement that would justify moving him again. His current foster home had previously adopted a foster child, whom he called his "best brother"; Clark had seen them embrace and play cooperatively.

Clark's goal was to place C.B. with a sibling or siblings because they had a strong emotional bond. Originally, Clark had hoped to place him with L.B., Jr., but C.B.'s history of assaulting another younger child in that home had prevented that from happening up to now. C.B. still had regular visits and sleepovers there, and the foster parents would be open to considering placement, but only if it did not risk the safety of the other adoptive child. J.B.'s foster home had an in-home day care center, and it would not be appropriate to place C.B. there until he could consistently demonstrate that he could be safe with younger children. C.B. was aggressive not only with his siblings, but with young children in general; he was acting out what he had learned in seven years.

If C.B. could learn to act safely around his siblings, it would be desirable to place him with one or more of them. But if such placement would "recreat[e] the trauma bond from the family of origin," it would be better to place him elsewhere. When the siblings came together, they "regress[ed] to what they kn[e]w" and acted out violently. But they

14

were having frequent visits, including weekends and overnights, so that they could learn new ways to interact.

Clark planned to arrange extended visits for C.B. within 60 days at his brothers' prospective adoptive homes, to ascertain whether he could be placed in either one. If not, Clark would recruit homestudy-approved homes within a 100-mile radius that would commit to adopting C.B. and to maintaining sibling contact.

When prospective adoptive parents go through the homestudy process, they receive intensive training in dependent children's "therapeutic issues." They are fully informed about the psychological histories of potential placements. They also have a series of free placement visits. Thus, they know far more than typical foster parents do about the needs of the children placed with them. Although C.B. had "acting-out behaviors," they were "for the most part . . . consistent with what families are trained to expect from children coming out of chronic and insidious neglect." Therefore, in spite of his behaviors, he could easily be adopted.

J.B. and L.B., Jr., were thriving in their foster homes. Both homes were interested in adopting and were completing or updating their homestudies.

The parents' visitation negatively affected the minors' stability, especially that of C.B. According to their caretakers, after visits they became defiant and oppositional for one to two days. The parents caused this effect by ignoring the minors during visits and failing to meet their emotional needs. C.B. described one visit as "terrible and horrible"; he felt "sad" and "mad" because he was ignored. The parents' visitation, though beneficial for K.B. and A.B., was detrimental for C.B. and P.B.

At one visit, father told J.B. that J.B. was "in charge," which meant that J.B. felt free to hurt C.B. C.B., in turn, said that he put other children in headlocks or head-butted them because "dad said you could hurt children younger than you." C.B. did not like it when J.B. hurt him.

15

The boys had a bond with the parents, but, like their bond with each other, it had elements of a "trauma bond." Living in a filthy home where their injuries sometimes went untreated, being "home schooled" (i.e., not going to school), and being exposed to domestic violence between the parents, the minors failed to form healthy and secure attachments. They were allowed to be aggressive to one another. Their accomplishments were not acknowledged. All of this would have an impact on their interactions with peers, classmates, teachers, foster parents, and each other. So long as their aggressive behavior was permitted, it continued.

Clark asked the boys several times how they would feel about being adopted. The answers were "nebulous." The boys had mixed feelings about their foster families and about not going home. C. B. said he wanted to "go back . . . to New Mexico." (Clark did not know if the birth family had lived there before, or if that was where they wanted to go after reunifying.) They talked about belongings in the birth parents' home. But they also talked about liking their foster homes. Clark did not know how much short-term detriment they would suffer from termination of parental rights, but they would gain stability and the meeting of their needs, including their emotional needs, by their care providers. On balance, adoption would be more beneficial than preserving the bond with their parents.

Adoption would also offer more stability and permanence than legal guardianship, because the birth parents would not be able to intervene and create confusion. In particular, it would be undesirable if K.B. were adopted but J.B., living in the same household and closely bonded with her, were put on unequal terms with her by being placed into legal guardianship.

Father testified that he visited the boys once a month, the last time a few days before the hearing. That visit had gone well; they played and talked. The boys smiled and ran to see the parents when visits started. When visits ended, they were sad. The boys called him "[d]ad." In his opinion, their bond was not a trauma bond.

16

Mother testified that the visits with the boys went well; they greeted her as "[m]om" when the visits began and were sad when the visits ended. She visited as often as she could and was on time for visits. It would be detrimental to the boys if they could not see her again "[b]ecause I'm mom." It was not true that the parents had told the children they did not have to go to school, and K.B. did not testify to that. They always went to school. They did not have mixed feelings about returning home; they wanted to return home. J.B. said so every time he saw her. It was true that the three boys sometimes punched, hit, and scratched each other, but "they are boys. Boys are going to play rough."

The juvenile court found by clear and convincing evidence that the boys were likely to be adopted. As to C.B., the court stated: "I think at the outset at the trial, the Court had a little more question[] about the adoptability of [C.B.], but with the evidence that's been presented, the Court is convinced, as I indicated, by clear and convincing evidence that he likely will be adopted." The court also found there was a lack of evidence to establish either the sibling bond or the parental relationship exceptions to adoption.

Therefore, the juvenile court ordered the termination of parental rights as to the boys and the selection of a permanent plan of adoption.

DISCUSSION

I

*The Trial Court Correctly Found C.B. Adoptable*

The parents contend there was no substantial evidence that C.B. is adoptable. We disagree.

"If the court determines . . . by a clear and convincing standard, that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption." (§ 366.26, subd. (c)(1).)

We review the juvenile court's finding that the child is likely to be adopted within a reasonable time under the substantial evidence standard, giving it the benefit of every reasonable inference and resolving any evidentiary conflicts in favor of affirming. (*In re I.I.* (2008) 168 Cal.App.4th 857, 869 (*I.I.*).) That is, we must determine whether the record contains substantial evidence from which the court could find clear and convincing evidence that the child was likely to be adopted within a reasonable time. (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1232 (*B.D.*).)

"The 'clear and convincing' standard specified in section 366.26, subdivision (c)(1), is for the edification and guidance of the trial court and not a standard for appellate review. [Citations.] . . . Thus, on appeal from a judgment required to be based upon clear and convincing evidence, the clear and convincing test disappears and 'the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong.' [Citation.]" (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1525-1526.)

Determination of whether a child is likely to be adopted focuses first upon the characteristics of the child; therefore, a finding of adoptability does not require "that the minor already be in a potential adoptive home or that there be a proposed adoptive parent 'waiting in the wings.' [Citations.]" (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649; accord, *I.I., supra*, 168 Cal.App.4th at p. 870.) The juvenile court need not find that a child is "generally adoptable" before terminating parental rights. (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1313.)

Here, social worker Clark opined as an expert on adoption that although C.B. had a history of conflict with siblings and other children and had been rejected by two placements for assaultive behavior on younger children, by the time of the section 366.26 hearing, he was performing much better in most respects. He had adjusted very well to his latest placement, which had another child in the home. He was doing so well in therapy that the amount was about to be reduced. He wanted to be good and tried very

hard to improve. He was succeeding in school and had friends there. He was "charming," "engaging," "cute," "funny," "affectionate," and "[f]or the most part . . . a delightful child." Although he had not yet learned effective coping strategies for a child of his age, he was doing so. His brothers' foster parents were willing to consider placement if he could show that he had learned not to attack smaller children. But even if he could not immediately show that, his acting-out behaviors were not beyond what prospective adoptive parents are trained and prepared to deal with, and Clark knew of numerous families who would be interested in a child with C.B.'s characteristics. Finally, Clark laid out a timetable for beginning extended visits in the foster homes of C.B.'s siblings within 60 days, and deciding after those visits had taken place whether to expand the search to a well-defined circle of potential adoptive parents (those within 100 miles who would commit to maintaining sibling contact as well as to permanency). Thus, substantial evidence supported the juvenile court's finding that C.B. was likely to be adopted within a reasonable time. (See *I.I., supra*, 168 Cal.App.4th at p. 871 [positive traits pointing to adoptability even where negative traits also existed].)

The parents finely parse Clark's testimony in the light least favorable to the judgment, improperly highlighting those parts which appear adverse to C.B.'s prospects for speedy adoption while downplaying the rest. In her reply brief, mother asserts that she is not asking this court to disregard or to reweigh Clark's testimony, but we see no other way to read her account of that testimony. However, the juvenile court considered Clark's testimony in full and concluded that it had allayed any doubts the court might have had about C.B.'s adoptability. When performing substantial evidence review, we may not substitute our judgment for that of the juvenile court.

The parents also cite a number of cases which are supposedly on point. All are distinguishable.

In *In re Asia L.* (2003) 107 Cal.App.4th 498, the minors' emotional and psychological problems were extreme, requiring "specialized placements"; no

19

prospective adoptive parents had been identified; the current foster parents expressed only a vague willingness to explore adoption, without any indication that they would decide the matter quickly; and there was no evidence of other approved families interested in adopting children with the minors' particular problems. (*Id.* at pp. 510-512.) But here, Clark testified that C.B.'s emotional and psychological problems were not beyond the level that prospective adoptive parents in general know how to deal with, and there was evidence that the efforts of C.B.'s therapists and his current foster parent (who found C.B. less difficult than other foster children she had worked with) were ameliorating those problems. Clark also testified, based on her experience as an adoptions specialist, that if it became necessary to look beyond the adoptive parents of C.B.'s brothers, there were numerous families (some without other children at home, the biggest problem for C.B. up to now) who would welcome a child with C.B.'s characteristics. Finally, Clark laid out a timeline to help the juvenile court determine whether adoption could occur within a reasonable time.

In *In re Brian P.* (2002) 99 Cal.App.4th 616, the minor suffered from major developmental difficulties (being unable to speak clearly or walk without difficulty at the age of four and a half), and there was no evidence supporting the social worker's conclusory assertion that the minor was adoptable. (*Id.* at pp. 624-625.) C.B. had no such grave difficulties, and Clark's reports and testimony provided abundant evidence to support her claim of adoptability.

In *In re Jayson T.* (2002) 97 Cal.App.4th 75, the minors were found unadoptable by prospective adoptive parents with whom they had already been placed, due to reactive attachment disorder (the inability to form loving attachments). (*Id.* at p. 82.) Furthermore, the issue of adoptability had not been litigated in the juvenile court before the placement was made. (*Id.* at p. 83.) Here, there is no evidence that C.B. suffers from reactive attachment disorder, and adoptability was thoroughly litigated below.

In *In re Jerome D.* (2000) 84 Cal.App.4th 1200, the finding of adoptability rested only on the willingness to adopt of one prospective adoptive parent, whose criminal and CPS history had not yet been investigated.  There was no showing as to any other possible adoptive families.  Furthermore, the adoptability assessment did not consider the minor's close relationship with his birth mother, or the fact that the minor's prosthetic eye needed care and treatment.  (*Id.* at p. 1205.)  No similar facts exist in the present case.

In *In re Tamneisha S.* (1997) 58 Cal.App.4th 798, the only issue was whether, in light of the Legislature's statutory preference for adoption, the juvenile court could properly order legal guardianship because it found the agency had not shown clear and convincing evidence of adoptability (a finding to which the reviewing court deferred under the abuse of discretion standard).  (*Id.* at pp. 800, 803, 806-807.)  Thus, the case is procedurally as well as factually inapposite.

Lastly, in *In re Amelia S.* (1991) 229 Cal.App.3d 1060, there were 10 minors, all with developmental, emotional, and/or physical problems, divided among numerous foster homes.  The agency's assertion that the minors were likely to be adopted was unsupported by evidence.  Not only did the minors have special needs, but they were defined as part of a sibling set of 10 and therefore hard to place; yet no families willing to consider adoption had been identified.  (*Id.* at pp. 1062-1063.)  The present case could hardly be more different.

The parents have shown no grounds to reverse the finding that C.B. was adoptable.

II

*The Beneficial Parental Relationship Exception Did Not Apply*

Mother contends the juvenile court erred by finding the beneficial parental relationship exception to adoption (§ 366.26, subd. (c)(1)(B)(i)) did not apply.

" 'At the selection and implementation hearing held pursuant to section 366.26, a juvenile court must make one of four possible alternative permanent plans for a minor

21

child. . . . *The permanent plan preferred by the Legislature is adoption.* [Citation.]' [Citations.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.)

There are only limited circumstances permitting the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child . . . ." (§ 366.26, subd. (c)(1)(B).) One of these is where the parent has maintained regular visitation and contact with the child *and* the child would benefit from continuing the relationship, often referred to as the beneficial parental relationship exception. (§ 366.26, subd. (c)(1)(B)(i).) The benefit to the child must promote "the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*); accord, *In re C.F.* (2011) 193 Cal.App.4th 549, 555 (*C.F.*).) Even frequent and loving contact is not sufficient to establish this benefit absent a significant, positive, emotional attachment between parent and child. (*C.F., supra*, 193 Cal.App.4th at p. 555; *Autumn H., supra*, 27 Cal.App.4th at p. 575.)

"Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350 (*Jasmine D.*).)

The party claiming the exception has the burden of establishing the existence of any circumstances that constitute an exception to termination of parental rights. (*C.F., supra*, 193 Cal.App.4th at p. 553.) The factual predicate of the exception must be supported by substantial evidence, but the juvenile court exercises its discretion in weighing that evidence and determining detriment. (*In re K.P.* (2012) 203 Cal.App.4th 614, 622; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.)

"On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*Autumn H., supra*, 27 Cal.App.4th at p. 576.) " '[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge.' " (*Jasmine D., supra*, 78 Cal.App.4th at p. 1351.)

Although the parents visited the minors regularly, there was substantial evidence that their visits were detrimental to at least some of the minors, who felt ignored and that their parents did not respect them, and who showed signs of emotional disturbance for a day or two after visits. Out of all the minors, only K.B. affirmatively expressed the wish that the visits should continue. Thus, the first prong of the beneficial parental relationship exception, regular visitation, was not unambiguously favorable to the parents.

But even if visitation counts in the parents' favor, the second prong of the exception -- whether the benefit of continuing the relationship would outweigh the benefit of adoption -- unequivocally counts against them. Even K.B. was happy with her foster parents, who met her needs as the parents had never done, and with whom she would choose to live if the choice were hers; J.B. was also happy there. P.B., A.B., and L.B., Jr., were similarly thriving in their placements. All of these minors' foster parents met their needs and were committed to providing permanency through adoption.

23

Although C.B. was not in an adoptive placement, he was also improving and having his needs met in a way that had never occurred in the parents' home.

Finally, the parents' relationship with the minors was not on balance positive because it amounted to a "trauma bond" and reinforced their worst attitudes and behaviors. Furthermore, the parents saw nothing wrong with what they had done before losing custody of the minors, which suggested that they had no motive or insight to change the negative aspects of their relationship with the minors.

Mother asserts in her reply brief that the juvenile court should have opted for a permanent plan of legal guardianship. Because this contention was not raised in her opening brief, it is forfeited. In any event, mother does not explain why the court should have ignored the statutory preference for adoption where children have been found adoptable.

Mother has shown no ground for reversing the termination of her parental rights.

III

*Father's Contention Regarding Termination of His Parental Rights Is Unavailing*

Father contends that if we reverse the termination of mother's parental rights, we must also reverse the termination of his parental rights. Since we do not reverse the termination of mother's parental rights, we also do not reverse the termination of father's parental rights.

DISPOSITION

The orders terminating parental rights are affirmed.

      HULL      , J.

We concur:

   NICHOLSON, Acting P. J.

   DUARTE  , J.